

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00299-CV

———————————————

IN THE INTEREST OF E.T., A CHILD

On Appeal from the 322nd District Court
Tarrant County, Texas
Trial Court No. 322-699128-21

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant J.T. (Father) appeals the termination of his parental rights to his daughter, E.T. (Emily).[1] The termination was premised on the trial court's findings that (1) Father had violated three of the statutory predicate grounds listed in Texas Family Code Section 161.001(b)(1), including the conduct-based endangerment ground; and (2) termination was in Emily's best interest. *See* Tex. Fam. Code Ann. § 161.001(b). Father challenges the sufficiency of the trial court's predicate findings as well as its best interest finding. Because we conclude that there is sufficient evidence (1) of the conduct-based endangerment predicate finding and (2) that termination was in Emily's best interest, we will affirm.

## I. Background

Father and M.M. (Mother) had two children: H.T. (Holly) in 2019 and Emily in early 2021.[2] Before Emily was born, Mother's eight other children lived in the home with her and Father as well. *See N.H.*, 2022 WL 4374638, at *1–3 (discussing factual history in Holly's termination appeal). But due to drug and domestic-abuse

---

[1]We use aliases to refer to children (Emily and her sister, Holly), and we refer to adult family members based on the adult's relationship to Emily. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]Father's and Mother's parental rights to Holly were terminated in a separate proceeding. *See In re N.H.*, No. 02-22-00157-CV, 2022 WL 4374638, at *1–14 (Tex. App.—Fort Worth Sept. 22, 2022, no pet. h.) (mem. op.).

concerns, the Department of Family and Protective Services removed Holly and Mother's other children in July 2020.[3]  *See id.* at *3.

Then, in April 2021, when Emily was not quite one month old, Mother gave Emily "two to three tablespoons of Benadryl."[4]  Although Mother told the doctors that she had administered the Benadryl "to help with [an] allergic rash" that Emily was experiencing,[5] she admitted that she was "tired and overwhelmed on that day" and was taking prescription pain medication so she "didn't actually pay attention" to the Benadryl dosage.  Within hours of taking the Benadryl, Emily vomited and, in Mother's words, "had a bad reaction to it."  Father and Mother took Emily to the

---

[3]As we noted in *In re N.H.*, "Mother [wa]s no stranger to the Department" and had a history of concerning incidents dating back to 2007.  *Id.* at *2.  When the Department began discussing placements for Mother's children in 2020, Mother's then-17-year-old son ran away.  The Department removed Mother's seven other children—Holly and six half-siblings.

[4]There was conflicting evidence regarding the amount of Benadryl that Mother administered.  At trial, the Department's investigator stated that Mother told her she gave Emily "two to three tablespoons."  But the hospital medical records reflect that, when Mother took Emily to the hospital, she initially told the doctors that she gave Emily "3 table spoonfuls of Benadryl over a 6[-]hour period," but "[a]fter further questioning[,] she said she used the dropper and gave 1 dropper full each time . . . g[iving] her this amount three times over a period of 6 hours."  At Holly's 2022 termination trial, Mother testified that she had administered "about a teaspoon to 2 teaspoons" of Benadryl.

[5]According to the Department's investigator, Mother insisted that a two-to-three-tablespoon serving of Benadryl "wasn't a lot" for an infant.

3

emergency room,[6] and she was admitted into the intensive care unit and stayed there for several days.

Later that month, Emily was removed,[7] and soon thereafter, her hair-strand drug test came back positive for amphetamine and methamphetamine.[8]  *See N.H.*, 2022 WL 4374638, at *4.

After Emily's removal, the trial court entered temporary orders that required Father to comply with the Department's service plan as a condition of Emily's return. Father's service plan required him to complete, among other things, individual counseling, a psychological evaluation, drug testing, and a domestic-violence-prevention program.  Father's caseworker testified that Father made "some progress" on his service plan, including attending the domestic-violence-prevention program.

Meanwhile, Holly's termination case proceeded to trial, and in May 2022, Father's parental rights to Holly were terminated for conduct-based and environment-based endangerment.[9]  *See id.* at *1, 6, 11–12, 14.

---

[6]It is unclear if Father was at home when Mother gave Emily the Benadryl.

[7]Prior to removal, the Department implemented a safety plan in which Mother and Father agreed to be supervised by a designated relative.  The Department later learned information that disqualified the relative as an approved supervisor.

[8]Emily's hair-strand test was taken approximately three to five days after she was removed.  The Department's investigator explained that, generally, "[h]air testing goes back three months, three to four months."  Neither Mother nor Father tested positive for methamphetamine before or after Emily's removal, and the Department investigator acknowledged that it was odd for a child to test positive for a drug that the parents had not tested positive for.

Emily's termination case went to trial approximately one month after Holly's, and a transcript of Holly's trial was admitted into evidence at Emily's trial with no objection from Father's counsel.[10] As we noted in our review of Holly's case, the record reflects "that [Father] ha[d] a continuing pattern of domestic violence and criminal activity." *Id.* at *14. In addition to the transcript from Holly's trial, the Department offered other evidence of Father's concerning behavior, including evidence that Father had tested positive for drugs after Emily was removed and evidence that Father had lived with Mother in violation of his felony bond for a significant portion of Emily's case.

After hearing the evidence, the trial court found that Father had (1) "knowingly placed or knowingly allowed [Emily] to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child, pursuant to § 161.00l(b)(l)(D), Texas Family Code," (2) "engaged in conduct or knowingly placed [Emily] with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child, pursuant to § 161.00l(b)(l)(E), Texas Family Code," and (3) "had his parent–child relationship terminated with respect to another child based on a finding that the [F]ather's conduct was in violation of § 161.00l(b)(l)(D) or

_____

[9]Later, the State offered a certified copy of Holly's termination order into evidence at Emily's termination trial. Father did not object to the exhibit, and it was admitted.

[10]Mother's counsel objected to the transcript as cumulative, but the objection was overruled.

5

(E), Texas Family Code ... pursuant to § 161.00l(b)(l)(M), Texas Family Code." Based on these findings, together with a finding that termination was in Emily's best interest, *see* Tex. Fam. Code Ann. § 161.001(b)(2), the trial court terminated Father's parent–child relationship with Emily.[11]

## II. Discussion

To terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy at least one statutory predicate ground listed in Family Code Section 161.001(b)(1) and (2) that termination is in the child's best interest. *Id.* §§ 161.001(b)(1), (2), 161.206(a), (a–1); *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Father challenges the legal and factual sufficiency of the trial court's three predicate findings along with that of its best interest finding. But "'[t]o affirm a termination judgment on appeal, a court need uphold only one [predicate] termination ground' plus the best interest finding." *In re A.N.*, No. 02-22-00036-CV, 2022 WL 2071966, at *2 (Tex. App.—Fort Worth June 9, 2022, pet. denied) (mem. op.) (quoting *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019)); *see In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022). Therefore, we need address only two findings: (1) the trial court's predicate finding that Father engaged in an endangering course of conduct under

---

[11]The trial court also terminated Mother's parental rights to Emily, but Mother has not appealed.

6

Section 161.001(b)(1)(E) of the Family Code,[12] and (2) the trial court's best interest finding. Tex. Fam. Code Ann. § 161.001(b)(1)(E), (b)(2).

## A.  Standard of Review

When reviewing the sufficiency of clear-and-convincing termination findings,[13] we must determine whether a reasonable factfinder could have formed a firm belief or conviction that the challenged findings were true. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020).  Both legal and factual sufficiency turn on this question; the distinction between the two sufficiency analyses "lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In our legal sufficiency analysis, we view the evidence "in the light most favorable to the finding," assuming that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so and disregarding all evidence that a reasonable factfinder could have disbelieved. *Z.N.*, 602 S.W.3d at 545; *see A.C.*, 560 S.W.3d at 630–31.  "Factual sufficiency, in comparison, requires

---

[12]Generally, because the trial court's endangerment findings under Subsections (D) and (E) "can serve as predicate grounds for terminating [Father's] parental rights to other children," due process requires us to "address at least one of the two challenged endangerment findings, even [if] the findings may not be dispositive." *A.N.*, 2022 WL 2071966, at *2.

[13]Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *J.F.-G.*, 627 S.W.3d at 311 n.14.

weighing disputed evidence contrary to the finding against all the evidence favoring the finding" to determine if "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("When the factual sufficiency of the evidence is challenged, only then is disputed or conflicting evidence under review.").

The two sufficiency determinations overlap in many respects; if the evidence is factually sufficient, it is necessarily legally sufficient. *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op.). Because Father challenges both factual and legal sufficiency, we will conduct a consolidated review.

## B.    Conduct-Based Endangerment

Father challenges the legal and factual sufficiency of the trial court's conduct-based endangerment finding under Subsection (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E).

### 1.    The Law on Conduct-Based Endangerment

Parental rights may be terminated based on a predicate finding under Subsection (E) if the trial court concludes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers

8

the physical or emotional well-being of the child."[14]  *Id.*  This requires a "voluntary, deliberate, and conscious course of conduct" rather than "a single act or omission." *A.O.*, 2022 WL 1257384, at *9 (first quoting *In re J.B.*, No. 02-21-00239-CV, 2021 WL 6144074, at *21 (Tex. App.—Fort Worth Dec. 30, 2021, no pet.) (mem. op.); and then quoting *In re B.K.*, No. 02-21-00175-CV, 2021 WL 5848769, at *4 (Tex. App.—Fort Worth Dec. 9, 2021, pet. denied) (mem. op.)).  The evidence of a parent's endangering course of conduct "is not limited to actions directed towards the child"—the trial court may consider actions before the child's birth and actions while the child is not in the parent's presence because all such actions may "create an inference that similar conduct could recur and further jeopardize a child's well-being."  *A.O.*, 2022 WL 1257384, at *9 (first quoting *J.F.-G.*, 627 S.W.3d at 315 n.43; and then quoting *In re M.W.*, No. 02-21-00146-CV, 2021 WL 3679247, at *4 (Tex. App.—Fort Worth Aug. 19, 2021, pet. denied) (mem. op.)); *see J.O.A.*, 283 S.W.3d at 345.

### 2.    Application:  Father's Endangering Conduct

Here, there is evidence that Father engaged in a course of conduct involving (1) abuse, (2) disregard for the law, and (3) drugs.

As we noted in *In re N.H.*, the record reflects that Father engaged in a pattern of domestic violence:

---

[14]To "'[e]ndanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *8 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.) (quoting *Tex. Dep't of Human Servs.*).

- In late 2018, while Mother was pregnant with Holly, Father assaulted Mother. He was convicted of assault family violence for his actions. Tex. Penal Code Ann. § 22.01(a)(1).

- In May 2019, while Mother was still pregnant with Holly, Mother and Father got into an argument because Father wanted Mother to give him money for marijuana. After the argument, Mother left for a friend's house, and a neighbor notified Mother that her house was on fire. *N.H.*, 2022 WL 4374638, at \*5. Mother called the police and told them that she believed Father had set her house on fire out of anger. One of her children later referred to Father as the "boyfriend that burned down the other house." *Id.* at \*6.

- In March or April 2020, Mother called the police because Father broke a window in her apartment while Holly and Mother's seven other children were all present. *Id.* at \*5.

- In August 2020, Mother and Father got into a fight, and Mother sought assistance from the police in retrieving clothing from her home.

- While Mother was pregnant with Emily in September 2020, Father hit Mother in the face with a closed fist, causing her to fall. Mother later explained that she had told Father that they should temporarily "separate" to focus "on getting the kids back" but that Father had interpreted this as Mother "saying [she] didn't want to be with him," and "[h]e got really upset."[15] Father was charged with enhanced assault family violence, a third-degree felony. Approximately one week before Emily's termination trial, he was convicted and sentenced to ten years in prison. Tex. Penal Code Ann. § 22.01(b)(2)(A).

- As part of Holly's termination case, in early 2022, the trial court interviewed several of Emily's half-siblings. One of those half-siblings indicated that Father had hurt him, and another half-sibling indicated that Father "hurt [his] mom" by "knock[ing] her out."

"Violent or abusive conduct directed at the other parent or other people, even if it is

not committed in the child's presence, may . . . be sufficient to show a[n endangering]

---

[15]Mother confirmed that Father was "heavily intoxicated on alcohol" at the time.

course of conduct under [S]ection 161.001(b)(1)(E)." *A.S.*, 2016 WL 3364838, at *7; *see In re B.W.*, No. 02-19-00009-CV, 2019 WL 2415324, at *1 (Tex. App.—Fort Worth June 6, 2019, no pet.) (supp. mem. op.) ("Domestic violence, want of self[-]control, and propensity for violence may be considered as evidence of endangerment.") (quoting *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.)). And when the violence is committed in a child's presence, against a child, or against the mother while she is pregnant, it is particularly significant. *See J.I.T.P.*, 99 S.W.3d at 845 (noting that "the trial court could have considered the domestic violence, especially the blow that hit [the child] and the parents' altercation during [the mother's] pregnancy, as evidence of [conduct-based] endangerment to [the child]"). Here, Father not only had a pattern of violence, but he committed multiple instances of violence in the presence of Mother's children and against Mother while she was pregnant.

Although Mother insisted that Father had stopped abusing her after the September 2020 assault,[16] given the record as a whole, a reasonable factfinder was not required to believe this testimony. *See A.S.*, 2016 WL 3364838, at *8 (noting, in discussion of domestic violence as part of Subsection (E) analysis, that "the trial court was not required to believe [the father's] version of the events"). But even if the trial court believed Mother, "a parent's short-term, positive . . . behavior does not nullify

---

[16]After the September 2020 assault, Father checked himself into a mental health hospital and received medication.

earlier endangering conduct such that the trier of fact must set the earlier conduct aside." *J.F.-G.*, 627 S.W.3d at 316; *see J.O.A.*, 283 S.W.3d at 346 (recognizing that "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices").

Moreover, domestic violence was not Father's only concerning conduct. The record also reveals that Father "ha[d] a continuing pattern of . . . criminal activity," *N.H.*, 2022 WL 4374638, at *14, and violated his bond conditions throughout the pendency of Emily's case. By the time Emily was born in March 2021, Father was out on bond for the September 2020 felony assault he had committed against Mother. Father's bond conditions prohibited him from having contact with the complainant— Mother. But Mother and Father continued to live together in violation of Father's bond, even while Emily's termination proceeding was pending.[17] Although Mother claimed that Father moved to a hotel in October 2021, Father did not notify the Department of this alleged move, and when Father's rights to Holly were terminated in May 2022, the termination order listed the same "[c]urrent address" for both Father and Mother.[18]

---

[17]Until mid-to-late 2021, the Department was not aware that Father's bond conditions prohibited him from having contact with Mother.

[18]The same was true of Emily's termination order; although Father was incarcerated when his rights to Emily were terminated in June 2022, the "[c]urrent address" listed for Father on Emily's termination order was the same as that for Mother.

Just months later, in June 2022, Father was convicted of the felony assault family violence charge. Father was incarcerated at the time of Emily's termination trial, and he was serving a ten-year sentence. Such "[e]vidence of . . . incarceration and its effect on a parent's life and ability to parent may establish an endangering course of conduct" because it "[s]ubject[s] a child to the p[ossibility] that she will be left alone because her parent is in jail." *A.S.*, 2016 WL 3364838, at *8 (affirming Subsection (E) finding).

On top of the evidence of domestic violence, bond violations, and incarceration, the Department also presented evidence that drugs were an issue:

- In 2020, Mother admitted that she and Father would leave the house—sometimes staying out overnight—to smoke marijuana. *N.H.*, 2022 WL 4374638, at *2.

- Father admitted to a history of cocaine and marijuana use, and he admitted to using drugs with a child—Mother's then-17-year-old son.[19] Mother and several of her children also confirmed that Father would smoke marijuana with the 17-year-old in the family's bathroom and on the patio. *Id.*

- In 2020, four of Emily's half-siblings tested positive for drugs while living with Mother and Father. *N.H.*, 2022 WL 4374638, at *3.

- After Emily's removal, in May 2021, Father tested positive for codeine and morphine. Father explained this by stating that, the day before his drug test, he had suffered a workplace injury, been transported to the hospital, and taken painkillers. There was conflicting testimony regarding the nature of the painkillers, though. Father told the caseworker that Mother gave him

_____

[19]At Emily's termination trial, Father testified that the only drug he had ever used around children was marijuana and that he had only smoked marijuana with Mother's child one time. He stated that the only other drug he had used was cocaine, which he had used once or twice.

hydrocodone without a prescription; he testified at Holly's trial that he had taken Tylenol 3 without a prescription, *id.* at *4; and he testified at Emily's termination trial that he had taken an unknown medication prescribed to him at the hospital.

- In November and December 2021, Father failed to appear for Department-requested drug tests, and "[t]he trial court could have reasonably inferred from [his] failure to attend the drug screenings that []he avoided the testing because []he was using drugs." *In re J.W.*, No. 2-08-211-CV, 2009 WL 806865, at *5 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.); *see In re L.T.*, No. 02-22-00197-CV, 2022 WL 15053329, at *7 (Tex. App.—Fort Worth Oct. 27, 2022, no pet. h.) (mem. op.) (noting presumption when mother failed to appear for drug tests).

- Father failed to appear for another scheduled drug test in February 2022, again "presumably because []he would have tested positive." *L.T.*, 2022 WL 15053329, at *7.

- Mother—who was a nurse[20]—admitted that she had provided Father with prescription-only pain medications despite his lack of a prescription, and Father admitted taking the drugs.[21]

"[N]arcotics can impair or incapacitate the user's ability to parent,"[22] *A.N.*, 2022 WL 2071966, at *4 (quoting *In re M.M.*, No. 02-21-00185-CV, 2021 WL 5227177, at *6 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.)), and a pattern of drug use can support a finding of conduct-based endangerment.

---

[20]Mother was employed as "an LVN" at the time of trial.

[21]Mother tested positive for cocaine in December 2020, positive for cocaine in March 2021, and positive for opiates in September 2021.

[22]Indeed, Mother demonstrated this truism when she testified that, at the time she gave Benadryl to Emily, Mother had been taking prescription pain medication so she "didn't actually pay attention" to the precise Benadryl dosage. Although there was no evidence that Mother lacked a prescription for her pain medication, her testimony nonetheless acknowledged the impact of such strong substances on her ability to parent.

Given the evidence of these three patterns of conduct—Father's abusive behavior, his consistent disregard for the law, and his use of illegal drugs—even if such evidence is weighed in light of all of the disputed evidence, *see A.C.*, 560 S.W.3d at 630–31, a reasonable factfinder could have formed a firm belief or conviction that Father "engaged in conduct or knowingly placed [Emily] with persons who engaged in conduct which endanger[ed] . . . [Emily's] physical or emotional well-being." *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *see B.W.*, 2019 WL 2415324, at *2 (recognizing that "[i]t is beyond doubt that violence and illicit drug use endanger a child's physical and emotional well-being" and affirming trial court's Subsection (E) finding). And because the evidence of conduct-based endangerment is factually sufficient, "then it is necessarily legally sufficient as well." *A.S.*, 2016 WL 3364838, at *7. We overrule Father's second issue and affirm the trial court's finding of conduct-based endangerment under Subsection (E).[23] Tex. Fam. Code Ann. § 161.001(b)(1)(E).

## C. Emily's Best Interest

Father also challenges the legal and factual sufficiency of the trial court's finding that termination was in Emily's best interest. *See id.* § 161.001(b)(2).

---

[23]Because we affirm the trial court's Subsection (E) finding, we need not address Father's challenges to the trial court's other predicate findings. *See* Tex. R. App. P. 47.1; *L.T.*, 2022 WL 15053329, at *5.

### 1. The Law on Best Interest

The best interest inquiry "is child-centered and focuses on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631; *see In re A.S.*, No. 02-19-00429-CV, 2020 WL 2071944, at *7 (Tex. App.—Fort Worth Apr. 30, 2020, pet. denied) (mem. op.). In our review of a best interest finding, we consider several factors, including (1) the emotional and physical needs of the child; (2) the stability of the home or proposed placement; (3) the emotional and physical danger to the child; (4) the plans for the child by those seeking custody; (5) the desires of the child; (6) the acts or omissions of the parent indicating that the parent–child relationship is not a proper one; and (7) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307 (listing additional factors). "Evidence that supports the statutory predicate findings may also be probative of the child's best interest." *A.O.*, 2022 WL 1257384, at *14.

### 2. Application: Emily's Best Interest

Just as Father's abusive conduct, disregard for the law, and drug use supported the trial court's predicate finding under Subsection (E), so that same conduct supports the trial court's finding that termination was in Emily's best interest.

Father's domestic abuse against Mother—particularly while she was pregnant with Emily—endangered Emily's physical safety, and his pattern of abusive behavior created a presumption that similar conduct could recur. *A.S.*, 2016 WL 3364838, at *9 (affirming best interest finding in part because the father "displayed a volatile

16

temperament that other evidence showed could escalate to physical violence against a person whom he supposedly cared for or, at the very least, against a person whom the child cared for—[m]other"); *see Holley*, 544 S.W.2d at 372 (listing best interest factors including the emotional and physical danger to the child). The domestic abuse was also a violation of the law, as Father's assault convictions demonstrate. *See* Tex. Penal Code Ann. § 22.01. Considering this abuse together with the evidence of Father's consistent bond violations, the record "demonstrated a pattern of lawbreaking that created instability and a looming threat of incarceration." *A.O.*, 2022 WL 1257384, at *15–16 (affirming termination when mother "violated the Penal Code, she violated her community supervision, and she violated the conditions of her bond"); *see Holley*, 544 S.W.2d at 372 (listing best interest factors including the stability of the parent's home). Indeed, Father was incarcerated at the time of trial and could not provide a stable home for Emily or care for her physical needs. *See Holley*, 544 S.W.2d at 372 (listing best interest factors including the physical needs of the child and the stability of the home). Father's drug use added to the threat of instability while also "reflect[ing] a dysfunctional parent–child relationship because [Father] could not or would not maintain the sobriety necessary to provide for [Emily's] physical and emotional needs." *L.T.*, 2022 WL 15053329, at *8 (stating similarly regarding mother who had a pattern of drug use and affirming best interest finding); *cf. Holley*, 544 S.W.2d at 372 (listing best interest factors including parental actions that indicate an improper parent–child relationship).

In addition, there was other evidence that termination was in Emily's best interest:

- At the time of trial, Emily was living in an adoption-motivated foster home, and she lived there with Holly and two of their half-siblings.[24] *Cf. Holley*, 544 S.W.2d at 372 (listing best interest factors including the plans for the child). Emily's caseworker testified that Emily was bonded to the three siblings in her foster home.

- Father's proposed plan for Emily was to return her to Mother, whom he described as "a very good mother." *Cf. id.* (listing best interest factors including the plans for the child). At trial, Emily's caseworker confirmed that Emily was bonded to the two siblings who were living at home with Mother. But the trial court subsequently found that Mother had endangered Emily's well-being by engaging in endangering conduct and exposing Emily to an endangering environment, and the court terminated Mother's parental rights. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Mother has not appealed that judgment.

Emily was one year old at the time of termination, so her desired placement was not known. *Cf. Holley*, 544 S.W.2d at 372 (listing best interest factors including desires of the child). Father testified that he loved Emily and that he had bonded to her in the month she had lived with him and Mother.

Additionally, Father testified that his assault conviction demonstrated his intention to "own up to my mistakes and failure." *Cf. id.* (listing best interest factors including any excuse for the acts or omissions of the parent). The trial court was not required to adopt this interpretation of Father's conviction, though, particularly in light of the transcript from Holly's termination trial. In that trial, Father "pled the Fifth Amendment when asked whether he had struck Mother in May 2019, when

---

[24]Emily's foster mother attended the termination hearing.

18

asked whether he had ever assaulted Mother while she was pregnant with Holly or Emily, . . . when asked whether he had assaulted Mother in December 2018[,] . . . . when asked whether his bond conditions stemming from the [then-]pending assault case prevented him from contact with Mother[,] and when asked whether he had been living with Mother throughout the case." *N.H.*, 2022 WL 4374638, at *5; *see also id.* at *11 ("The trial court was permitted to draw negative inferences from [Father's] repeated invocations of the Fifth Amendment.").

Whether we view all of this evidence in the light most favorable to the judgment or weigh all of the disputed evidence, *see A.C.*, 560 S.W.3d at 630–31, we must conclude that a reasonable factfinder could have formed a firm belief or conviction that termination was in Emily's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We overrule Father's fourth issue.

## III.  Conclusion

The record contains legally and factually sufficient evidence to allow a reasonable factfinder to form a firm belief or conviction that Father's course of conduct endangered Emily's well-being and that termination was in Emily's best interest.  *Id.* § 161.001(b)(1)(E), (b)(2).  Having overruled Father's dispositive second and fourth issues, we affirm the trial court's judgment.  Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: November 23, 2022